## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **ALICIA RHOME,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **CIVIL ACTION NO. 23-05923** |
| | ) | |
| **v.** | ) | **SECTION "A" JUDGE** |
| | ) | **JAY C. ZAINEY** |
| **PROGRESSIVE SERVICES INC., TODD** | ) | |
| **BRITTO, ABC INSURANCE COMPANIES,** | ) | **MAG. DIV. (4)** |
| **AND DOE DEFENDANTS 1-10,** | ) | **MAGISTRATE JUDGE KAREN** |
| | ) | **WELLS ROBY** |
| **Defendants.** | ) | |
| | ) | |

## FIRST AMENDED COMPLAINT

NOW INTO COURT, through undersigned counsel, comes Plaintiff, Alicia Rhome, who files this First Amended Complaint against her former employer, Progressive Services, Inc. (d/b/a Progressive Roofing), pursuant to Title VII of the Civil Rights Act of 1964, the Equal Pay Act, the Louisiana Employment Discrimination Law, Louisiana Human Rights Act, and other Louisiana state laws as set forth herein.

## INTRODUCTION

1.      This case is about Alicia Rhome, an experienced professional roofer and mechanic who was discriminated against by her employer, Progressive Services, Inc., and sexually harassed by her co-workers. When she complained, she was terminated.

2.      Ms. Rhome was also paid less than her male counterparts, despite their having the same or less skill and experience.

3.      Ms. Rhome worked for Progressive Services, Inc. as a roofer and mechanic from 2016 to 2020 and again from July 2022 to January 2023.

4.      Ms. Rhome is an experienced, highly skilled roofer who routinely out-worked her male counterparts. Throughout Ms. Rhome's employment, her direct supervisor, Todd Britto, sexually harassed her both verbally and physically.

5.      This harassment occurred on a daily basis and in front of other Progressive employees.

6.      Ms. Rhome reported the harassment to several supervisors on multiple occasions and filled out a formal report with her employer.

7.      Ms. Rhome was put on paid leave following the report, but was never contacted to make a statement during the supposed investigation.

8.      Ms. Rhome was eventually reinstated, but with different job responsibilities and at a new location from before her report.

9.      No action was taken against her harasser and she was forced to interact with him on at least one subsequent occasion.

10.     Shortly after being reinstated, Ms. Rhome was terminated.

11.     As a result of this experience, Ms. Rhome has experienced anxiety, embarrassment, loss of income, and other damages.

12.     Accordingly, Ms. Rhome brings this lawsuit.

## I.      PARTIES

*Plaintiff*

13.     **Alicia Rhome** is a person of full age of majority who is domiciled in St. Bernard Parish, Louisiana.

*Defendants*

14.     **Progressive Services, Inc. (d/b/a Progressive Roofing)** is a corporation based in Phoenix, Arizona. At all times relevant hereto, Progressive Roofing was licensed and authorized

to conduct business in the State of Louisiana and did conduct business in the State of Louisiana. According to its website, Progressive Services, Inc. employs more than 1,200 employees and has "over 40 branch offices coast to coast."[1] Plaintiff was employed at Progressive Roofing's New Orleans, Louisiana location, which operated throughout Plaintiff's employment with the company.

15.    **Todd Britto** is, by information and belief, a person of the full age of majority. At all times relevant to this lawsuit, he was employed by co-Defendant Progressive Services, Inc. at its New Orleans office.

16.    **ABC Insurance Companies** are any as-yet-unidentified insurance companies which may cover some or all of the allegations in this lawsuit.

17.    **Doe Defendants 1-10** are any as-yet-unidentified individuals who may be liable for some or all of the allegations in this lawsuit.

## II.    VENUE AND JURISDICTION

18.    Venue is proper pursuant to 28 U.S.C. § 1391 as a substantial part of the events giving rise to the claims occurred in the Eastern District of Louisiana.

19.    This Court has personal jurisdiction over Plaintiff and Defendants.

20.    This Court has subject matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331, in that Ms. Rhome's claims arise under the laws of the United States. Specifically, she brings this action under the Equal Pay Act. This court has supplemental jurisdiction over Ms. Rhome's claims arising from state law in accordance with 28 U.S.C. § 1367.

21.    Ms. Rhome timely filed a charge of discrimination with the Equal Opportunity Employment Commission regarding the allegations herein on April 12, 2023, within 180 days of her January 10, 2023, termination. The EEOC issued a Notice of Right to Sue letter on January 17, 2024. Ms. Rhome has exhausted her administrative remedies as to her Title VII claims.

---

[1] https://progressiveroofing.us/about-progressive-roofing/.

22.     Claims brought under the Equal Pay Act do not require exhaustion of administrative remedies. *Stith v. Perot Systems Corp*., 122 Fed. App'x. 115, 119 (5th Cir. 2005) (citing *County of Washington v. Gunther*, 452 U.S. 161, 175 n.14, 101 S.Ct. 2242, 68 L.Ed.2d 751 (1981)).

### III.     FACTUAL ALLEGATIONS

23.     Ms. Rhome incorporates by reference all other paragraphs of this Complaint as if fully set forth here.

24.     Progressive Services, Inc. (d/b/a Progressive Roofing) (hereinafter "Progressive") is a nationwide construction company which employs more than 1,200 employees.

25.     Plaintiff Alicia Rhome is a 38-year-old Black woman with extensive experience as a roofer and mechanic.

26.     Ms. Rhome first worked for Progressive as a roofer and mechanic from 2016 to 2020. After voluntarily leaving Progressive to work for other roofing companies out of state, Ms. Rhome returned to Progressive and was re-hired in July 2022.

27.     In both periods of employment with Progressive, Ms. Rhome was responsible for installing new roofs on commercial properties, making repairs on existing roofs, various paperwork tasks, and other tasks related to commercial roofing.

28.     According to the sworn statement of Stanley Waterhouse, "Alicia was a good and hardworking roofer. She was experienced, knowledgeable, and highly skilled. She was better equipped and outworked most of the men on the job and would always get the job done. She treated everyone with respect; she is a good person who would give you the shirt off her back. Alicia never disrespected anyone; she is very honest and tells the truth." Ex. B at ¶ 8.

29.     Although Ms. Rhome received an employee handbook when she was hired in July 2022, Progressive did not provide any training regarding employment discrimination, sexual harassment, or what steps she should take if she would be sexually harassed on the job.

30.     According to the sworn statement of foreman Wallace Washington, "the company never had any training about sexual harassment or what to do if an employee was sexually harassed." Ex. A at ¶ 20.

31.     According to the sworn statement of Stanley Waterhouse, "the company never provided employees with training about employment discrimination or sexual harassment. The company never told us what to do if we experienced or witnessed sexual harassment on the job." Ex. B at ¶ 6.

*Sexual Harassment*

32.     Ms. Rhome was sexually harassed by her supervisor, Defendant Todd Britto, whose actions were not properly investigated or disciplined by Progressive.

33.     Ms. Rhome first interacted with Britto in July 2022 while working on a project at the LSU Woman's Hospital.

34.     Britto specifically requested that Ms. Rhome be assigned to his team.

35.     Ms. Rhome was thereafter assigned to Britto's team and was often the only individual assigned to his team.

36.     Britto began to sexually harass Ms. Rhome in August 2022, within a week of her beginning work on the Folger's worksite.

37.     Britto was a crew member and mechanic at the start of the project, but he was promoted to foreman – Ms. Rhome's supervisor – in or around August 2022.

38.     Britto specifically requested from his Progressive superiors to work with Ms. Rhome because he "needed some eye candy" and "needed something to look at."

39.     According to the sworn statement of Wallace Washington, a foreman at Progressive who witnessed interactions between Ms. Rhome and Britto on the Folger's worksite, "Todd was always trying to make advances toward Alicia. He was always trying to come on to her. One thing

that I remember hearing him say about Alicia was 'I'll tear that up.' I took that to mean that he would have sex with her." Ex. A at ¶ 14.

40.     Washington reports that "[o]ther employees working on the Folgers job told me that Todd made inappropriate and sexual comments to Alicia and about Alicia on the job site." Ex. A at ¶ 15.

41.     According to the sworn statement of Stanley Waterhouse, another employee who witnessed interactions between Ms. Rhome and Britto on the Folger's worksite, "[t]hroughout my time with Progressive, male employees, including foremen and other supervisors, regularly made many disrespectful and derogatory comments about women and about Alicia." Ex. B at ¶ 9.

42.     For example, he reports that there "was a common joke about Alicia at Progressive; because she was the only woman in the field, many male employees at Progressive made comments about 'time to get your dicks up' or 'put your dicks up' when talking about working with Alicia." Ex. B at ¶ 10.

43.     According to the statement of Waterhouse, Britto "wanted Alicia sexually and always tried to play on his role as the foreman to get her to be with him sexually." Ex. B at ¶ 19.

44.     Britto continued to make similar comments on a daily basis to Ms. Rhome and their co-workers.

45.     At the start of each Folger's shift, Ms. Rhome and her co-workers had to climb a 40-foot-tall ladder to reach the hospital roof. Britto made sexually explicit comments about Ms. Rhome while watching her climb the ladder, such as saying she looked "damn fine," commenting about her pants and uniform, stating that he wished to be in her pants, and saying that he loved watching her climb the ladder. Such comments were pervasive and were made by Britto to Ms. Rhome nearly every day that they worked together from August through November.

46.     Similarly, Britto repeatedly made sexual comments at the Folger's site when Ms. Rhome was wearing a job-required safety harness on the roof, such as that he wished he was strapped around her body like the harness or that she would look better in the harness without any clothes on. These comments were made every time Ms. Rhome had to wear a harness, at least once per week between August and November.

47.     In or around September 2022, Ms. Rhome had to purchase a new vehicle when her truck broke down.

48.     In or around late September 2022, Britto told Ms. Rhome, in front of their co-workers on the Folger's site, that she should "give him some" (meaning sex) since he gave her money to buy the car, referring to her Progressive income.

49.     On several occasions during the workdays on the Folger's site, Britto asked Ms. Rhome to take walks with him so they could be alone.

50.     In or around October 2022 on the Folger's worksite, Britto told Ms. Rhome that she "did not have to give up [her] pussy for his job" so "what was [she] worrying about?" and that she "need[ed] to relax."

51.     In November 2022 on the Folger's worksite, Britto intentionally dropped a package of condoms on the roof next to Ms. Rhome. When she handed the package back to him, Britto asked Ms. Rhome if she wanted to have sex with him with her hard hat on.

52.     Approximately every other day between August and November at the Folger's worksite, Britto asked Ms. Rhome to have sex with her in her car during the workday.

53.     On one occasion, on or about November 17, 2022, Britto threatened Ms. Rhome while at the Folger's worksite and told her to "shut the fuck up."

54.     On at least one occasion in November 2022, Britto followed Ms. Rhome to her vehicle parked at the Folger's site, verbally threatening her.

55.     It was clear even to others that Britto's repeated sexual advances toward Ms. Rhome were unwelcome.

56.     According to the sworn statement of Washington, "I could tell that Alicia did not want Todd to come on to her. She wanted him to stop." Ex. A at ¶ 16.

57.     Washington states that "Alicia told me that Todd was making her uncomfortable and that she wanted him to stop." Ex. A at ¶ 18.

58.     Many of these harassing comments were made in front of Progressive supervisors including Ben Butler and Dewan Smith.

59.     Instead of taking action to prevent further harassment, Wallace, Butler, and Smith laughed at Britto's comments.

60.     This indifference emboldened Britto, who became more brazen in sexually harassing Ms. Rhome.

61.     In September 2022, following his promotion, Britto began physically harassing Ms. Rhome on the Folger's site in addition to the continued verbal harassment.

62.     This harassment included rubbing parts of his body against Ms. Rhome. Throughout September 2022, Britto routinely rubbed his shoulders or upper body against Ms. Rhome's chest while they were working together at the Folger's site.

63.     Beginning in or around early September 2022, Britto rubbed his genitals against Ms. Rhome's buttocks several times each day at the Folger's site while sliding past her.

64.     In or around October 2022, Britto wrapped his arms around Ms. Rhome while she was welding at the Folger's site.

65.     Britto physically sexually harassed Ms. Rhome multiple times a week and sometimes multiple times during one shift on the Folger's site.

66.     Ms. Rhome verbally demanded Britto to stop when there was physical contact, saying "stop," "move," "you're too close," "back up," and "get away." Britto ignored these demands and continued to physically harass Ms. Rhome.

67.     Britto also forced Ms. Rhome to come in early or work after hours when it would just be the two of them on the Folger's job site, which terrified her.

68.     Ms. Rhome continued to complain to supervisors after the harassment turned physical, but again nothing was done to stop Britto.

69.     For instance, in September 2022, Ms. Rhome made verbal complaints to Butler and other supervisors.

70.     She specifically made requests to be transferred off of Britto's team, or to a different worksite.

71.     Those requests were denied.

72.     Ms. Rhome continued to make verbal complaints to her supervisors throughout the duration of her employment.

73.     Butler brushed off Ms. Rhome's complaints of harassment, saying that Britto "liked" her or "had a crush on" her. He took no action to investigate the complaints.

74.     On November 11, 2022, Ms. Rhome again complained to Butler, this time via text message, and explained the fear and stress Britto was causing.

75.     Butler did not respond to her text.

76.     Waterhouse testifies that the "company knew that Todd was sexually harassing Alicia on the job site, but they did not want to deal with her." Ex. B at ¶ 23.

77.     On November 15, 2022, Britto tried to stop Ms. Rhome from clocking out at the end of the work day. Britto followed her to her vehicle, telling her multiple times to "shut the fuck up" and threatening to follow her home.

78.     The next morning, Ms. Rhome texted Butler, again explaining the harassment and its effect on her, stating in part that she had to "cry every morning just to deal with his man to get around his overbearing flirtatious stressful shit just so that I can make money" to support her family.

79.     Butler did not respond, but after Ms. Rhome called him shortly thereafter he instructed her to make a report at Progressive's office.

80.     Ms. Rhome then went to Progressive's local office to report the harassing behavior. However, the individual drafting the complaint left out several instances of harassment.

81.     Ms. Rhome then spoke to Andrew Rogers, a Progressive superintendent based out of the Phoenix headquarters, who put her on paid leave while the complaint was investigated.

82.     However, no one from Progressive ever contacted Ms. Rhome to investigate her claims of harassment.

83.     On information and belief, while Ms. Rhome was on leave, Britto was given a raise of an extra $2.00 or $3.00 per hour.

84.     Meanwhile, Ms. Rhome's payments were delayed while on leave.

85.     On or about December 5, 2022, Ms. Rhome received a phone call from Rogers and was told there was no evidence of harassment.

86.     When Ms. Rhome asked for clarification since no one had ever contacted her about the harassment, Rogers stated "there's nothing we can do. There's not enough evidence. Case closed."

87.     Rogers then informed Ms. Rhome that her paid leave was ended and that she was to report to the job site the next morning.

88.     After returning to work, Ms. Rhome's co-workers told her that Britto had continued to make sexual comments about her in her absence, such as spreading a rumor that she had slept with multiple people on the crew.

89.     One co-worker called Ms. Rhome a "rat" for reporting the harassment, which made her fearful of reporting further harassment.

90.     Ms. Rhome's job responsibilities and location were altered after returning from leave.

91.     On or about January 10, 2023, Ms. Rhome was assigned to a job site with Britto.

92.     The next day, Ms. Rhome could not access her pay records on the Progressive website. Rogers informed her that her employment had been terminated.

93.     Progressive was planning to shut down its New Orleans location, but Ms. Rhome was selected as among the first employees to be fired.

94.     She was fired months earlier than other employees because she reported harassment.

95.     Waterhouse reports that "Progressive did not shut down its New Orleans location at the time that Alicia was fired. There were people working for Progressive in New Orleans for several months after she was fired, well into the spring of 2023. The company offered many employees a $1,500 incentive to stay and finish the job." Ex. B at 28.

96.     Other employees were also relocated to different Progressive locations and were able to continue employment. Ms. Rhome was not offered an opportunity to relocate, but would have done so had such an offer been made and the allegations herein properly dealt with by Progressive.

97.     If Ms. Rhome had not refused her supervisor's sexual advances, she would not have been terminated.

98.     Ms. Rhome's co-workers at Progressive, including supervisors at Progressive, knew of Britto's harassing behavior even before she made an official report.

99.     Throughout the harassment, Ms. Rhome experienced fear for her personal safety, often having to hide her movements to clock in and out or hiding in the bathroom to avoid Britto.

100.     Ms. Rhome also experienced anxiety, negative mood changes, embarrassment, loss of appetite, and other issues as a result of the harassment.

*Equal Pay Discrimination*

101.     Ms. Rhome was one of only two female roofers during her 2016-2020 employment.

102.     When Ms. Rhome was hired in July 2022, she was the only female roofer of about 25 to 30 roofers employed by Progressive's New Orleans office.

103.     According to Waterhouse, based on the work Rhome "was doing and her skills and leadership ability, should have been in a supervisory position for Progressive. She was more than well qualified for a supervisory position with Progressive." Ex. B. at 13.

104.     Ms. Rhome was compensated at a rate of $20.00 per hour.

105.     Ms. Rhome later discovered that her co-workers – all male – were employed at a higher rate of pay, many earning approximately $24.00 per hour and some up to $30.00 per hour, despite having similar or less relevant experience in the field.

106.     This was explicitly because she was a woman: Waterhouse testifies that "Progressive refused to pay her what she should have been paid because she was female." Ex. B at ¶ 14.

107.     Ms. Rhome was also denied opportunities for advancement, which were enjoyed by her male counterparts.

108.    "For example, there was one young employee named Chris who could not read or write, but he was made a foreman for Progressive and was paid a lot more than Alicia was." Ex. B at 14.

109.    Throughout her employment, male employees with less experience were promoted above Ms. Rhome, complete with a per-hour pay increase.

110.    Progressive did not have a seniority system to determine pay and, if it did, Ms. Rhome would have outranked several of her male counterparts.

111.    Waterhouse states that "After Alicia made her complaint to the office, Progressive gave me and many other employees, including foremen and roofers, raises. They did not give Alicia a raise." Ex. B at ¶ 26.

112.    Some of these less experienced male counterparts did not know how to perform some basic roofing and mechanical tasks and others had been trained by Ms. Rhome.

113.    Ms. Rhome had to complete daily paperwork for her superiors because they did not know how to do so.

114.    Progressive did not use a formal interview process or application to decide on promotions, and Ms. Rhome was never considered for a promotion during her tenure.

## IV.    CLAIMS FOR RELIEF

### Count One – Sexual Harassment in Violation of Title VII of the Civil Rights Act of 1964

*Asserted against Defendants Progressive and ABC Insurance Companies only*

115.    Plaintiff realleges and incorporates each and every foregoing paragraph.

116.    Title VII of the Civil Rights Act prohibits an employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

117.    Sexual harassment is a form of discrimination based on sex under Title VII. *See, e.g. Lemaire v. Louisiana Dept. of Transp*., 480 F.3d 383, 387 (5th Cir. 2007).

118.    A plaintiff can prove discrimination under Title VII with either circumstantial or direct evidence. *Laxton v. Gap, Inc.*, 333 F.3d 572, 578 (5th Cir.2003).

119.    Here, Ms. Rhome belongs to a protected class (female) and she was subjected to repeated unwelcome harassment based on her sex by her supervisor, Todd Britto.

120.    The harassment was both verbal and physical and was so severe or pervasive that it altered the conditions of her employment.

121.    Ms. Rhome specifically asked Britto to stop the harassment on several occasions, but he continued.

122.    Because of the harassment, Ms. Rhome was materially affected in her ability to do her job, suffering anxiety and other issues described above while at her workplace.

123.    Ms. Rhome's co-workers and supervisors knew of the harassment before her official report, but failed to intervene.

124.    After Ms. Rhome reported the harassment, Progressive failed to conduct a sufficient investigation because, among other issues, Ms. Rhome was never questioned about the allegations.

125.    Ms. Rhome was terminated as a result of the allegations herein.

126.    Ms. Rhome was also subject to *quid pro quo* sexual harassment such as when Britto told her she had to "give him some [sex]" because she received income from the job in which he was her supervisor.

127.    If Ms. Rhome had fulfilled Britto's harassment demands, she would not have been terminated. She did not and was subsequently fired as a result.

128.    Ms. Rhome reported Britto's sexual harassment to multiple supervisors, as well as representatives from Progressive's main office, but the reports were not investigated.

129.    Ms. Rhome was terminated after reporting the harassment.

130.    Progressive failed to use reasonable care to prevent or correct the sexual harassment.

131.    Progressive offered no training or information regarding procedures for reporting or preventing sexual harassment.

132.    Progressive is liable for Plaintiff's harassment by its employees because Defendant knew, or should have known, of the harassment and failed to take remedial action.

133.    As a result of Defendants' actions, Plaintiff has suffered monetary damages including but not limited to lost wages, and has suffered and continues to suffer severe mental anguish and emotional distress, including but not limited to, depressive symptoms, anxiety, and emotional pain and suffering for which she is entitled to an award of monetary damages and other relief.

134.    Ms. Rhome has alleged direct evidence of discrimination as well as a *prima facie* case of circumstantial discrimination because she is a member of a protected class, was qualified for her position, and suffered an adverse employment action while other similarly situated employees were treated more favorably because they were not the victims of harassment. *Rutherford v. Harris County Texas*, 197 F.3d 173, 184 (5th Cir. 1999).

135.    Plaintiff specifically asserts a Title VII sexual harassment claim against Defendants ABC Insurance Companies pursuant to the Louisiana direct action statute and within the limits of all applicable terms and policies.

### Count Two – Retaliation in Violation of Title VII of the Civil Rights Act
*Asserted Against Defendants Progressive and ABC Insurance Companies only*

136.    Plaintiff realleges and incorporates each and every foregoing paragraph.

137.    Title VII of the Civil Rights Act also protects employees who suffer an adverse employment action because they engaged in a protected activity. *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 408 (5th Cir. 1999).

138.    Many activities are considered "protected" under Title VII, including but not limited to reporting or opposing harassment. *Carter v. Town of Benton*, 827 F.Supp.2d 700 (W.D. La. 2010).

139.    Ms. Rhome engaged in protected activity when she reported the harassment to multiple supervisors as well as representatives of Progressive's main office.

140.    Ms. Rhome made both verbal reports and a formal written report.

141.    Ms. Rhome suffered multiple adverse employment actions, including (1) having her pay delayed during the investigation period, (2) changing her job responsibilities and location after being reinstated from leave, (3) being denied pay increases provided to her co-workers while she was on investigative leave, and (4) termination.

142.    The investigation was entirely pretextual.

143.    Ms. Rhome was not interviewed during the investigation.

144.    There is a causal link between the adverse employment action and the protected activity as the termination occurred shortly after being reinstated from leave and the day after having to work on the same site as her harasser.

145.    Further bolstering the causal link, Ms. Rhome's supervisor spread derogatory rumors about her while she was on leave and at least one Progressive employee called her a "rat."

146.    Ms. Rhome's harasser also received a pay raise during the investigation period.

147.    Ms. Rhome was terminated because she reported the harassment.

148.    If Ms. Rhome had not refused her supervisor's sexual advances, she would not have been terminated.

149.     As a result of Defendants' actions, Plaintiff has suffered monetary damages including but not limited to lost wages, and has suffered and continues to suffer severe mental anguish and emotional distress, including but not limited to, depressive symptoms, anxiety, and emotional pain and suffering for which she is entitled to an award of monetary damages and other relief.

150.     Plaintiff specifically asserts a Title VII retaliation claim against Defendants ABC Insurance Companies pursuant to the Louisiana direct action statute and within the limits of all applicable terms and policies.

**Count Three – Sexual Harassment in Violation of Louisiana's Employment Discrimination Law (La. R.S. 23:301, *et seq*)**

*Asserted against Defendants Progressive and ABC Insurance Companies only*

151.     Plaintiff realleges and incorporates each and every foregoing paragraph.

152.     The Louisiana Employment Discrimination Law (LEDL) makes it unlawful to "intentionally discriminate against any individual with respect to compensation, or terms, conditions, or privileges of employment, because of the … sex." La. R.S. § 23:332(A)(1).

153.     "Because Louisiana's anti-discrimination law is substantively similar to Title VII, interpretations of the federal statute are applicable to the parallel state laws." *Barbara J. Lash, et al v. Ethicon-Endo Surgery, Etc.*, No. 03-244, 2004 U.S. Dist. LEXIS 8109, at *5 n.2 (E.D. La. May 5, 2004) (citing *Trahan v. Rally's Hamburgers, Inc*., 696 So. 2d 637 (La. App. 1st Cir. 1997), *Spears v. Rountree Oldsmobile-Cadillac Co*., 653 So. 2d 182 (La. App. 2nd Cir. 1995)).

154.     The LEDL allows for two theories of sexual harassment for which an employer is liable: *quid pro quo* and hostile work environment. *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 751, 118 S. Ct. 2257, 2264, 141 L.Ed.2d 633 (1998).

155.     Ms. Rhome asserts both theories in this this lawsuit.

156.    "To establish a *quid pro quo* harassment claim, a plaintiff must show a causal nexus between the acceptance or rejection of a supervisor's sexual harassment and a resulting tangible employment action." *Frensley v. N. Miss. Med. Ctr., Inc.*, 440 F. App'x 383, 386 (5th Cir. 2011) (internal quotations omitted).

157.    To prevail on a hostile work environment claim under the LEDL, a plaintiff must show that she (1) belongs to a protected class; (2) was subjected to unwelcome harassment; (3) the harassment was motivated by her sex; (4) the harassment affected a term, condition, or privilege of employment; and "(5) the employer knew or should have known of the harassment and failed to take proper remedial action." *Gautreau v. Enlink Midstream Operating GP, LLC*, 2021-0796 (La. App. 1 Cir 05/25/22), 342 So. 3d 939, 952 (citing *Assamad v. Percy Square and Diamond Foods, L.L.C.*, 2007-1229 (La. App. 1 Cir. 7/29/08), 993 So. 2d 644, 648).

158.    "The type of conduct constituting sexual harassment includes unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature." *Id*.

159.    Ms. Rhome suffered harassment in violation of the LEDL under both theories for the reasons articulated under Count One and throughout this Complaint.

160.    By reason of Defendants' actions, Plaintiff is entitled to all legal and equitable remedies available for violations of LEDL, including lost compensation (including back pay, front pay or reinstatement, and benefits), compensatory damages, non-compensatory damages, pre-judgment and post-judgment interest, attorney's fees, costs, and all other and legal and equitable relief.

161.    Plaintiff specifically asserts a LEDL claim against Defendants ABC Insurance Companies pursuant to the Louisiana direct action statute and within the limits of all applicable terms and policies.

**Count Four – Retaliation in Violation of Louisiana's Employment Discrimination Law (La. R.S. 23:301, *et seq*)**

*Asserted against Defendants Progressive and ABC Insurance Companies only*

162.    Plaintiff realleges and incorporates each and every foregoing paragraph.

163.    To establish a *prima facie* case of retaliation under the LEDL, the plaintiff must prove: (1) she engaged in protected conduct; (2) that she suffered an adverse employment action; and (3) a causal link existed between the protected activity and the adverse employment action. *Levisee v. Excel Scaffolding & Leasing Corp*., 2020-1013 (La. App. 1 Cir 04/26/21) n.8 (citing *Hanley v. Doctors Hospital of Shreveport*, 35,527 (La. App. 2d Cir. 6/6/02), 821 So.2d 508, 519).

164.    By reason of Defendants' actions, Plaintiff is entitled to all legal and equitable remedies available for violations of LEDL, including lost compensation (including back pay, front pay or reinstatement, and benefits), compensatory damages, non-compensatory damages, pre-judgment and post-judgment interest, attorney's fees, costs, and all other legal and equitable relief.

165.    Plaintiff specifically asserts a LEDL claim against Defendants ABC Insurance Companies pursuant to the Louisiana direct action statute and within the limits of all applicable terms and policies.

**Count Five – Retaliation in Violation of the Louisiana Human Rights Act (La. R.S. § 51:2231 *et seq.*)**

*Asserted Against All Defendants*

166.    Plaintiff realleges and incorporates each and every foregoing paragraph.

167.    The Louisiana Human Rights Act ("LHRA") is intended to "safeguard all individuals within the state from discrimination because of … sex … in connection with employment …; to protext their interest in personal dignity and freedom from humiliation; to make available to the state their full productive capacities in employment …; and to further the interest, rights, and privileges within the state." La. R.S. § 51:2231.

168.   Under the LHRA, "[i]t shall be an unlawful practice for an employer … [t]o retaliate or discriminate in any manner against a person because he has opposed a practice declared unlawful by this Chapter or by [LEDL] or because he has made a charge, filed a complaint, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under this Chapter or by [LEDL]." La. R.S. § 51:2256.

169.   As alleged herein, Ms. Rhome reported Britto's sexual harassment and the failure of her supervisors to mitigate the harassment to her employer.

170.   In response, Defendants Progressive, Britto, and others conspired to retaliate against Ms. Rhome by failing to conduct/participate in a proper investigation into the allegations and subsequently terminating her employment.

171.   Ms. Rhome suffered damages as a result of that conspiracy.

172.   Plaintiff specifically asserts a LHRA claim against Defendants ABC Insurance Companies pursuant to the Louisiana direct action statute and within the limits of all applicable terms and policies.

**Count Six – Equal Pay Discrimination in Violation of the Equal Pay Act (EPA)**

*Asserted against Defendants Progressive Services Inc. and ABC Insurance Companies only*

173.   Plaintiff realleges and incorporates each and every foregoing paragraph.

174.   The Equal Pay Act proscribes discrimination "between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which [the employer] pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." 29 U.S.C. § 206(d)(1).

175.   To establish a *prima facie case* under the Equal Pay Act, a plaintiff must show "(1) that her employer is subject to the Act; (2) that she performed work in a position requiring equal

skill, effort and responsibility under similar working conditions; and (3) that she was paid less than members of the opposite sex." *Jones v. Flagship Int'l*, 793 F.2d 714, 722–723 (5th Cir. 1986) (To establish that her male counterparts engage in "equal work," the plaintiff need only prove that the "skill, effort and responsibility" required in the performance of the jobs is "substantially equal.").

176.    Here, Ms. Rhome was paid substantially less than her male counterparts, including those who had substantially the same skill and experience as well as those who had *less* skill and experience.

177.    This pay gap increased after Ms. Rhome reported the sexual harassment.

178.    Progressive did not have a seniority system to determine pay and, if it did, Ms. Rhome would have outranked several of her male counterparts.

179.    Further, Ms. Rhome's male counterparts, including her harasser, received promotions to which she was not provided an opportunity, despite the male counterparts having same or less skill and experience.

180.    Ms. Rhome had to complete daily work that was the responsibility of her promoted male counterparts because they were unable to complete those basics tasks following promotion.

181.    Defendant has discriminated against Plaintiff in violation of the EPA.

182.    During her employment between July 2022 and January 2023, Defendant paid Plaintiff, and/or directed that Plaintiff be paid, $20.00 per hour, which was less than similarly situated male employees performing equal work on jobs the performance of which require equal skill, effort and responsibility and which were performed under similar working conditions, including but not limited to:

      a.    Dawan Smith, a roofer with similar experience and the same responsibilities who, upon information and belief; was paid $23.00 or $24.00 per hour;

b.      William (last name unknown), a roofer with similar experience and the same responsibilities who, upon information and belief; was paid $23.00 or $24.00 per hour;

c.      Brandon (last name unknown), a roofer with significantly less experience and the same responsibilities who, upon information and belief, was paid $24.00 per hour;

d.      Stanley Waterhouse, a roofer with less experience but, upon information and belief, was paid $21.50 per hour; and

e.      At least three other roofers with significantly less experience but, upon information and belief, were paid $24.00 per hour.

183.    The differential in pay between Plaintiff and similarly-situated male employees was not due to any (i) a seniority system; (ii) a merit system; (iii) a system of earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex.

184.    Defendant did not act in good faith and created and perpetuated gender-based wage discrimination in violation of the EPA.

185.    The foregoing conduct constitutes a willful violation of the EPA within the meaning of 29 U.S.C. § 255(a).

186.    As a result of Defendant's gender-based discriminatory policies and practices, Plaintiff has suffered damages, including but not limited to, lost compensation and benefits.

187.    By reason of Defendant's discrimination, Plaintiff is entitled to all legal and equitable remedies available for violations of the EPA, including lost compensation (including back pay, front pay or reinstatement, and benefits), liquidated damages, pre-judgment and post-judgment interest, attorney's fees, costs, and all other legal and equitable relief.

188.    Plaintiff specifically asserts an EPA claim against Defendants ABC Insurance Companies pursuant to the Louisiana direct action statute and within the limits of all applicable terms and policies.

### Count Seven – Equal Pay Discrimination in Violation of Louisiana's Employment Discrimination Law (La. R.S. 23:301, *et seq*)

*Asserted against Defendants Progressive Services Inc. and ABC Insurance Companies only*

189.    Plaintiff realleges and incorporates each and every foregoing paragraph.

190.    Louisiana's Employment Discrimination Law (LEDL) makes it unlawful to "[i]ntentionally pay wages to an employee at a rate less than that of another employee of the opposite sex for equal work on jobs in which their performance requires equal skill, effort, and responsibility and which are performed under similar working conditions." La. R.S. 23:332(A)(3).

191.    For the same reasons asserted under Count Five, violation of the Equal Pay Act, Defendants have discriminated against Plaintiff under Louisiana's Employment Discrimination Law by paying Ms. Rhome less than her male counterparts.

192.    Plaintiff specifically alleges a LEDL pay discrimination claim against Defendants ABC Insurance Companies pursuant to the Louisiana direct action statute and within the limits of all applicable terms and policies.

### Count Eight – Assault and Battery

*Asserted against Defendants Todd Britto and ABC Insurance Companies only*

193.    Plaintiff realleges and incorporates each and every foregoing paragraph.

194.    Defendant Todd Britto engaged in non-consensual offensive or harmful physical contact with Ms. Rhome.

195.    This included rubbing parts of his body against Ms. Rhome, including rubbing his genitals against her buttocks.

196.    Ms. Rhome verbally demanded Britto to stop when there was physical contact, saying "stop," "move," "you're too close," "back up," and "get away."

197.    Britto ignored these demands and continued to physically harass Ms. Rhome.

198.    As a result of Britto's actions, Plaintiff has suffered severe mental anguish and emotional distress, including but not limited to, depressive symptoms, anxiety, and emotional pain and suffering for which she is entitled to an award of monetary damages and other legal and equitable relief.

### Count Nine – Violations of La. Civ. Code art. 2315.11

*Asserted against All Defendants*

199.    Plaintiff realleges and incorporates each and every foregoing paragraph.

200.    Harassers, such as Britto, are liable for damages caused by sexual assault "upon proof that the injuries on which the action is based were caused by an act or acts of sexual assault in the workplace." La. Civ. Code art. 2315.11.

201.    Britto committed sexual assault against Ms. Rhome in the workplace within the meaning of La. Civ. Code art. 2315.11.

202.    Employers, such as Progressive, are also responsible for such damages when caused "by their servants and overseers, in the exercise of the functions in which they are employed" when they "might have prevented the act which caused the damage, and have not done it." La. Civ. Code art. 2320; *see also Stewart v. Daigle Indus., LLC*, No. CV 22-00487-BAJ-SDJ, 2023 WL 322885, at *1 (M.D. La. Jan. 19, 2023) (finding that an employer may be liable for "tortious on-the-job conduct" of its employees, including sexual assault).

203.    Progressive knew, or should have known, of Britto's sexual harassment of Ms. Rhome and failed to take remedial action to prevent his sexual assault of Ms. Rhome.

204.    As a result of Britto's harassment and Progressive's failure to prevent it, Plaintiff has suffered severe mental anguish and emotional distress, including but not limited to, depressive

symptoms, anxiety, and emotional pain and suffering for which she is entitled to an award of monetary damages and other legal and equitable relief.

<b>Count Ten – State Law Direct Action Claim</b>

<i>Asserted against ABC Insurance Companies only</i>

205.    Plaintiff realleges and incorporates each and every foregoing paragraph.

206.    Defendants ABC Insurance Companies, upon information and belief, have issued and/or currently have in effect one or more policies of insurance covering Defendant(s) named herein.

207.    For valuable consideration received, these policies obligated Defendants ABC Insurance Companies, jointly and/or severally, to pay on behalf of their insured Defendant(s) any sums the insured Defendant(s) may become obligated to pay to Plaintiff or to indemnify their insured Defendant(s) for any sums the insured Defendant(s) may become obligated to pay to Plaintiff.

208.    By reason of their illegal acts set forth herein, Defendants Progressive and Britto are liable to Plaintiff for all damages and injuries she has suffered as a result.

209.    Upon information and belief, Defendants ABC Insurance Companies are contractually obligated to pay these sums on behalf of the insured Defendant(s).

210.    Upon information and belief, Defendants ABC Insurance Companies are liable to Plaintiff for any and all damages incurred by reason of the insured Defendant(s)' acts, up to their policy limits, notwithstanding the fact that the insured Defendant(s) may themselves be able to assert claims of privilege or immunity from liability.

211.    Under Louisiana Revised Statute § 22:655(B), Plaintiff brings a direct action against Defendants ABC Insurance Companies to recover any and all sums they are obligated to pay Plaintiff on behalf of their insureds or to indemnify their insureds.

**RELIEF REQUESTED**

212.    Wherefore Plaintiff respectfully requests judgment be entered against Defendants and that the Court grant the following:

    i.    Declaratory relief;

    ii.    Judgment against Defendants for Plaintiff's asserted causes of action;

    iii.    An award of economic damages in an amount to be determined at trial, including but not limited to back pay, front pay, and lost benefits;

    iv.    An award of compensatory damages;

    v.    An award of liquidated damages;

    vi.    An award of special damages;

    vii.    An award of punitive damages;

    viii.    An award of case costs and attorney's fees;

    ix.    An award of pre-judgment and post-judgment interest;

    x.    Order such other and further relief, at law or in equity, to which Plaintiff may be justly entitled.

Respectfully submitted,
/s/ *William Most*
**William Most, T.A. (La. Bar No. 36914)**
**David Lanser (La. Bar No. 37764)**
MOST & ASSOCIATES
201 St. Charles Ave., Ste. 2500, #9685
New Orleans, LA 70170
T: (504) 509-5023
Email: williammost@gmail.com
*and*
**Kerry A. Murphy (La. Bar No. 31382)**
**KERRY MURPHY LAW LLC**
201 St. Charles Ave.
Suite 2500, #1824
New Orleans, LA 70170
Telephone: (504) 603-1502
Facsimile: (504) 603-1503
Email: kmurphy@kerrymurphylaw.com